IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JOHN KENYON, et al.,

    Plaintiffs,

        v.                                           CIVIL NO.: 11-1883 (FAB)

HOSPITAL SAN ANTONIO, et al.,

    Defendants.

**OPINION AND ORDER**

**I.     PROCEDURAL HISTORY**

On September 7, 2011, plaintiffs filed their first complaint in the instant case for claims under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and Puerto Rico law, P.R. Laws Ann. tit. 31, §§ 5141, 5142. (D.E. 1). On August 14, 2012, plaintiffs filed an amended complaint, adding, *inter alios*, defendant Dr. Ricardo Cedeño-Rivera ("Dr. Cedeño-Rivera") and his conjugal partnership. (D.E. 42). Since then, plaintiffs have filed second and third amended complaints. (D.E. 43; 80).

Pending before the court is a motion to dismiss filed by Dr. Cedeño-Rivera and his conjugal partnership ("moving defendants").[1] (D.E. 83). Plaintiffs have filed a response in opposition.[2] (D.E. 116). For the reasons set forth below, moving defendants' motion is granted.

---

[1] Although ordinarily in a case where there is a lack of unanimous consent of all the parties under 28 U.S.C. § 636, a magistrate judge may only issue reports and recommendations on dispositive motions, the undersigned is issuing an opinion and order pursuant to the directives of the presiding U.S. District Judge. (D.E. 92).
[2] Although plaintiffs' response is untimely (see D.E. 109), the court will nonetheless consider plaintiffs' arguments in its analysis.

## II.  RELEVANT FACTUAL ALLEGATIONS

The following allegations are drawn from plaintiffs' third amended complaint. (D.E. 80). The factual allegations are taken as true for the purpose of the pending motion.

### A. August 14, 2010

Because the patient in question, CKM, ("the patient" or "CKM") was experiencing a fever and vomiting, her parents, John Kenyon ("Kenyon") and Rhea Minter ("Minter"), drove her to the emergency room of Hospital San Antonio ("HSA") around 3:30 a.m. on August 14, 2010.  The patient was weak, dehydrated, feverish, and exhausted from vomiting.  (D.E. 80, pt. B, ¶ 10).

At 3:30 a.m., the patient was triaged.  Dr. Cedeño-Rivera, a general practitioner, evaluated the patient after 5:00 a.m., ordered the taking of bodily fluid samples and treatment with Benadryl and IV fluids, and diagnosed her with gastroenteritis.  The laboratory results were read as normal.  At 9:10 a.m., the patient was evaluated by Dr. José Vélez Vargas ("Dr. Vélez Vargas").  He agreed with Dr. Cedeño-Rivera's treatment and diagnosis.  At 3:50 p.m., Dr. María de los A. Rodríguez-Maldonado ("Dr. Rodríguez-Maldonado") evaluated the patient, ordered treatment with solumedrol, and discharged the patient.  Id. ¶¶ 11-12.

"[Minter] told Dr. Rodríguez Maldonado she was concerned about the high levels of protein and KET that both blood and urine laboratory test results were normal [*sic*]." Id. ¶ 13. Minter pointed to the discolored urine, the blood in the urine, and the high creatinine levels. Dr. Rodríguez-Maldonado "dismissed her concerns."  Id.  When Minter asked again about the laboratory results and the diagnosis of gastroenteritis, Dr. Rodríguez-Maldonado waved her hands, said "it's normal," and prescribed suppositories.  Id.  A male nurse who spoke English reiterated that it was gastroenteritis as Dr. Rodríguez-Maldonado left.  Dr. Rodríguez "showed no concern for these results." Id.  The order for the patient's discharge was entered at 4:00 p.m.

and the patient left around 6:00 p.m. The patient was discharged despite having "an undiagnosed emergency medical condition that was not stabilized although it was clear from the laboratory results done at the facility that she was already in renal failure" due to "[a]bnormally high levels of creatinine." Id. ¶¶ 13-16.

### B.   September 8 and 9, 2010

On September 8, 2010, Dr. Navid Pourahmadi[3] ("Dr. Pourahmadi"), a family physician, made arrangements by telephone with physicians at the University Pediatric Hospital ("UPH") to first have the patient stabilized at HSA and then have her transferred by ambulance the same day. He wrote a referral note for the emergency room physicians. (D.E. 80, pt. B, ¶ 31).

Around 3:10 p.m., Minter, Kenyon, CKM, and her older siblings arrived at the HSA emergency room. Minter informed the nurse that CKM was expected by the doctors. "[S]he was told to take a number and wait for her turn with the public." Id. ¶¶ 32-33.

At 3:45 p.m., the triage nurse opened the patient's record and categorized her as "'urgent priority,' a category III out of IV, IV being the lease [*sic*] urgent category and I the most urgent." Id. ¶ 34. Around 5:00 p.m., Dr. Pourahmadi arrived at the emergency room and went to get the pediatrician on duty to attend to the patient. The pediatrician, Dr. Rodríguez-Maldonado, "complained to Dr. Pourahmadi that she did not have facilities to treat CKM and that it was a busy day at the ER." Id. ¶ 35. Dr. Pourahmadi told her that the nephrology team at UPH was expecting the patient's transfer and had issued instructions for her stabilization. Id. ¶¶ 34-36.

Dr. Rodríguez-Maldonado placed the patient on a stretcher in the hallway, installed an IV, and moved her to the observation area. At 4:50 p.m., Dr. Rodríguez-Maldonado evaluated the patient. At 5:00 p.m., she ordered a renal sonogram with a note stating "patient (with) acute

---

[3] Throughout the third amended complaint, the last name of this individual is referred alternatively as "Pourahmadi" and "Pourhamadi." (Compare D.E. 80, pt. B, ¶¶ 29-31, 69, pt. C, ¶¶ 35, 43, with D.E. 80, pt. B, ¶¶ 35-36, 43-44). Because the former spelling was used first, it will also be used throughout this report and recommendation.

3

renal failure." Id. ¶ 37.  By 7:10 p.m., Dr. Rodríguez-Maldonado "ordered STAT blood work, including CBC, SMA, CXR, Ca, Mg, PO4 and urinalysis." Id. ¶ 38.  She provisionally diagnosed the patient with "acute renal failure and anemia" with a "guarded" prognosis, and ordered a treatment of "KUB, renal sonogram, cardiac monitor, pulse oxymeter, heparin lock, and [keeping] CKM in the ER's observation area." Id.  At 7:00 p.m., Dr. Rodríguez-Maldonado signed a referral form "identif[ying] her recommendations as 'pediatric nephrologist and dialysis.'" Id. ¶ 39.  Also at 7:00 p.m., Dr. Rodríguez-Maldonado stated that the medication recommended for the treatment of the patient's condition was not available.  At 7:30 p.m., she ordered that the patient be transferred to "HPU/PICU." Id. ¶ 40.  The reasons given were "evaluation by pediatric nephrologist and pt. needs dialysis." Id. ¶¶ 37-40.

The emergency room record from September 8, 2010, includes "a history of a 6yr old female, hypoactive, vomiting for over a month, vomiting that day, no history of systemic illness, with a prior ER visit three (3) weeks before when she was sent home without medication even though she was found to have creatinine levels of 6.94 mg/dl, among others findings." Id. ¶ 41.  "Normal levels of creatinine in the blood are approximately 0.6 to 1.2 milligrams (mg) per deciliter (dl) in adult males and 0.5 to 1.1 milligrams per deciliter in adult females." Id. ¶ 42.

After Dr. Pourahmadi left the emergency room, Dr. Rodríguez-Maldonado told Minter that an ambulance would come at 7 p.m. to transfer the patient to UPH.  The transfer order was received at 7:30 p.m.  Except for a sonogram around 7:30 p.m., "[a]ll medical attention and care to CKM stopped after [Dr. Pourahmadi] left the ER." Id. ¶ 44.  "Dr. Roberto D. Latoni provided the results of the sonogram read as 'unremarkable' on September 9, 2010, transcribed September 10, 2010, after CKM was long gone from the facilities." Id. ¶ 45.  "The result reflected a poor

4

view of the kidney but since it was 'DD' or 'dictated on the day' September 9, 2010, it could not be repeated or done a second time as needed to better visualize the organs." Id. ¶ 43-45.

The family was left in the emergency room to wait for the ambulance. At 9:00 p.m., Minter completed and signed a "transfer Control Sheet with a list of documents and transfer information." Id. ¶ 46. During the early night, the patient vomited food and blood. The patient had "little food … earlier." Id. ¶ 47. No nurse or staffer came. When Minter asked for help to clean the patient, she was given paper towels, told to use a sink and faucet which had no running water, and was "left to fend for herself." Id.

At 8:17 p.m., laboratory results were given to an emergency room employee, showing creatinine levels identified as "critically high" at 8.27, phosphorus as critical at 6.4, and highly increased platelets of abnormal distribution. Id. ¶ 48. No medical orders followed.

After the patient had been left unattended for four hours, a male doctor appeared around 11:00 p.m. with an emergency medical technician or a paramedic from the ambulance service. They checked CKM and two other patients awaiting transportation. The paramedic told Minter that he was taking the other two patients first "because they were babies and there was more money in it." Id. ¶ 50. Minter was outraged and asked the doctor why the paramedic was deciding which patient was to be transferred first. The doctor "said it was policy." Id. ¶¶ 49-51.

At 5:00 a.m. on September 9, 2010, Mother got a call from the paramedic at the nurses' station. The paramedic told Minter that "UPH did not accept CKM's insurance plan and so the family needed to pay $350.00 in cash for before [sic] they would transfer CKM to UPH." Id. ¶ 52. Minter called the MCS Reforma office and was told that the charge was wrong and that the emergency room or hospital "just needed to 'charge it as a per diem.'" Id. ¶ 53. Minter went to

5

the administration office and was told that the emergency room doctor needed to make the arrangements. Id. ¶¶ 52-53.

A new emergency room doctor, Dr. Juan R. Jiménez Barbosa, informed Kenyon and Minter that he already made arrangements for an ambulance to arrive by 11:00 a.m. to transfer the patient. Laboratory results reported at 11:35 a.m. "indicated critically high levels of creatinine." Id. ¶ 55. The patient was still in the emergency room. There was still no medication available to treat her condition. A medical record entry at 11:35 a.m. labeled "Ped ER Note" stated that the patient was accepted to UPH due to acute renal failure, was pending ambulance transfer, and had instructions to call the awaiting physician at UPH prior to departure. Id. ¶ 56. The transfer order had been placed on September 8 at 7:30 p.m. by Dr. Rodríguez-Maldonado. No transfer or stabilizing treatment had yet occurred. Id. ¶¶ 54-57.

At 11:35 a.m., the supervising nurse called Lexmayris Ambulance, which returned the call at 11:40 a.m. indicating that it would arrive by 11:55 a.m. At 2:15 p.m., the patient was placed in an ambulance for transfer to the Pediatric Intensive Care Unit at UPH in San Juan, which was a drive of over two and a half hours. This was almost nineteen hours after the transfer was officially documented in the emergency room record. Dr. Juan R. Jiménez Barbosa ordered her discharge. There was no transfer document or certification in the emergency room record. There was no documentation accompanying the patient in her transfer except for the Control Sheet at 9:00 p.m. Id. ¶¶ 58-60.

### III. STANDARD OF REVIEW

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must limit its focus to the allegations of the complaint. Litton Indus., Inc. v. Colón, 587 F.2d 70, 74 (1st Cir. 1978). The inquiry is whether the allegations, accepted as true, show "a plausible entitlement" to the relief requested. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559

(2007).  To avoid dismissal, a plaintiff must "set forth factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory."  Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988).

Determining whether a complaint makes out a plausible entitlement to relief involves two steps.  See Ocasio Hernández v. Fortuño Burset, 640 F.3d 1, 11-12 (1st Cir. 2011) (citing Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).  First, the court should separate a complaint's factual allegations from any "legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," and disregard the latter.  Id. at 12 (quoting Iqbal, 556 U.S. at 678) (internal quotations omitted).  The court then treats non-conclusory factual allegations as true, "even if seemingly incredible."  Id.  Second, the court must determine if the factual content, taken as a whole, admits of "the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Iqbal, 556 U.S. at 678).  Only if it does will the complaint survive a motion to dismiss under Rule 12(b)(6).

## IV. ANALYSIS

Because an individual physician cannot be subject to a federal EMTALA claim[4] and plaintiffs have not claimed diversity jurisdiction in this case, plaintiffs must rely on supplemental jurisdiction under 28 U.S.C. § 1367 to include moving defendants in the instant case. Supplemental jurisdiction "exists when 'the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case."'"  Rodríguez v. Doral Mortg. Corp., 57 F.3d 1168, 1175 (1st Cir. 1995)

---

[4] It is generally accepted that doctors are not liable under EMTALA.  See Del Carmen Guadalupe v. Negrón Agosto, 299 F.3d 15, 19 (1st Cir. 2002) ("While we have not decided the issue whether EMTALA provides a cause of action against individual physicians, all circuits that have done so have found that it does not." (internal quotation omitted)); see also Delaney v. Cade, 986 F.2d 387, 393 (10th Cir. 1993) ("[T]he 'legislative history makes it clear that, far from intending to allow patients to sue doctors, Congress intentionally limited patients to suits against hospitals.'" (quoting Baber v. Hospital Corp. of Am., 977 F.2d 872, 876-78 (4th Cir. 1992))).  The court sees no reason to depart from this widely held view.

(quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)) (internal citations omitted). "In particular, '[t]he state and federal claims must derive from a common nucleus of operative fact.'"  Id.  Nevertheless, even if supplemental jurisdiction is authorized, a district court is not obliged to exercise the same. See Exxon Mobil Corp. v. Allapattah Services, Inc., 545 U.S. 546, 552 (2005).  Rather, a "district court has considerable authority whether to exercise this power, considering factors such as judicial economy, convenience, fairness to litigants, and comity." Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 191 (1st Cir. 2011).

The patient visited HSA, where Dr. Cedeño-Rivera worked, on two separate occasions in 2010: August 14 and September 8.  Dr. Cedeño-Rivera, however, was only present during the August 14 visit.  (D.E. 80, pt. B, ¶ 11).  Plaintiffs have alleged EMTALA and state law medical malpractice claims with respect to both of these visits.  If (1) plaintiffs sufficiently allege an EMTALA claim for at least one of these visits and (2) plaintiffs' medical malpractice claim against Dr. Cedeño-Rivera and the EMTALA claim derive from a common nucleus of operative fact, then this court should exercise supplemental jurisdiction with respect to moving defendants. See 28 U.S.C. § 1367(a).

### A.   August 14 Visit

With respect to the patient's visit to HSA on August 14, 2010, plaintiffs have failed to allege facts sufficient to establish a claim under EMTALA.  As moving defendants point out, plaintiffs' allegations establish that on August 14, 2010, "the patient was examined[,] laboratory tests were ordered, a diagnosis was made and she was given medications."  (D.E. 83, at 7; see also D.E. 80, pt. B, ¶¶ 10-16).  In response, plaintiffs argue that "CKM's medical condition was not correctly diagnosed on August 14, 2010," citing "laboratory results that show high protein or creatinine levels and grey-colored urine that Dr. María Rodríguez Maldonado and Dr. Cedeño ignored in their evaluation of the minor child." (D.E. 116, ¶ 47 (citing D.E. 80, pt. B, ¶¶ 11-15)).

"'The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an "adequate first response to a medical crisis" for all patients and "send a clear signal to the hospital community … that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress."'" Reynolds v. MaineGeneral Health, 218 F.3d 78, 83 (1st Cir. 2000) (quoting Baber v. Hospital Corp. of America, 977 F.2d 872, 880 (4th Cir. 1992)).  EMTALA is "merely an entitlement to receive the same treatment that is accorded to others similarly situated." Jones v. Wake County Hosp. Sys., Inc., 786 F. Supp. 538, 544 (E.D.N.C. 1991).  It is not violated by "'inadequate' screening or screening that leads to an incorrect diagnosis." Kelly v. Univ. Health Sys., No. 7:11-CV-24-FL, 2011 WL 9156378, at *2 (E.D.N.C. June 21, 2011), aff'd sub nom. Kelly ex rel. Coggins v. Univ. Health Sys., 455 F. App'x 297 (4th Cir. 2011), cert. denied, 132 S. Ct. 1927, 182 L. Ed. 2d 789 (U.S. 2012); see also Loaisiga-Cruz v. Hosp. San Juan Bautista, 681 F. Supp. 2d 130, 135 n.2 (D.P.R. 2010) ("The Court notes that, even if Plaintiff were to allege that the diagnosis of a fractured vertebrae was incorrect, such a mis-diagnosis would not create a cause of action under EMTALA, but rather, would create a cause of action under the applicable state malpractice law.").

Although plaintiffs allege that the patient's "undiagnosed emergency medical condition … was not stabilized," (D.E. 80, pt. B, ¶ 15), this does not establish a claim under EMTALA. The duty to stabilize under EMTALA only arises after a hospital "determines that the individual has an emergency medical condition." 42 U.S.C. § 1395dd(b)(1).  "Thus, the plain language of the statute dictates a standard requiring actual knowledge of the emergency medical condition by the hospital staff." Baber, 977 F.2d at 883; see also Eberhardt v. City of Los Angeles, 62 F.3d

1253, 1259 (9th Cir. 1995) ("As the text of the statute clearly states, the hospital's duty to stabilize the patient does not arise until the hospital first detects an emergency medical condition."); Brooks v. Maryland Gen. Hosp., Inc., 996 F.2d 708, 711 (4th Cir. 1993) ("EMTALA's role [is] imposing on a hospital's emergency room the duty to screen all patients as any paying patient would be screened and to stabilize any emergency condition *discovered*." (emphasis added)); Álvarez v. Vera, Civ. No. 04-1579 (HL), 2006 WL 2847376, at *6 (D.P.R. Oct. 2, 2006) ("A hospital must have had actual knowledge of the individual's unstabilized emergency condition if an EMTALA claim is to succeed."). In other words, EMTALA "does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they *should have been aware*." Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 145 (4th Cir. 1996) (emphasis added). Although laboratory results did show "[a]bnormally high levels of creatinine," plaintiffs acknowledge in the third amended complaint that the patient's condition was "undiagnosed" and as such that HSA did not have actual knowledge of the condition. (D.E. 80, pt. B, ¶¶ 15-16). That HSA should have been aware of the patient's renal failure but did not stabilize the condition certainly may constitute medical malpractice, but "EMTALA is not a malpractice statute." Brooks v. Maryland Gen. Hosp., Inc., 996 F.2d 708, 711 (4th Cir. 1993); see also Vickers, 78 F.3d at 145 (holding that, if EMTALA covered the situation where the hospital "should have been aware," it would "become coextensive with malpractice claims for negligent treatment"); Correa v. Hosp. San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995) ("EMTALA does not create a cause of action for medical malpractice."). "Congress deliberately left the establishment of malpractice liability to state law …." Id. As such, while "a refusal to follow regular screening procedures in a particular instance contravenes the statute, … faulty screening, in a particular case, as opposed to disparate

screening or refusing to screen at all, does not contravene the statute." Correa, 69 F.3d at 1192-93. "It is enough for purposes of EMTALA that none of the evidence demonstrates an attempt by [HSA] to 'dump' [the patient]; instead hospital personnel treated her for what they perceived to be her medical condition," gastroenteritis. Baber, 977 F.2d at 885. "The essence of [the duty to screen] is that there be some screening procedure, and that it be administered even-handedly," Correa, 69 F.3d at 1192, not that it be administered perfectly. Therefore, because no federal claim has been sufficiently alleged with respect to the hospital visit on August 14, 2010, no supplemental jurisdiction can exist based on the same.

### B. September 8 Visit

Even if plaintiffs sufficiently allege an EMTALA claim with respect to the patient's visit to HSA on September 8, 2010, they have failed to establish that the medical malpractice claim against Dr. Cedeño-Rivera's and the aforementioned EMTALA claim derive from a common nucleus of operative fact. The only allegation specifically concerning Dr. Cedeño-Rivera involved the patient's August 14 visit and is as follows:

> CKM was triaged at 3:30 AM and Dr. Ricardo Cedeño, a general practitioner, evaluated her at sometime after 5:00 AM. He ordered the taking of body fluid samples, and so blood and grey-colored urine samples were taken. The ordered treatment with Benadryl and IV fluids and she was diagnosed with gastroenteritis. All laboratory results were read as normal.

(D.E. 80, pt. B, ¶ 11). Plaintiffs argue that Dr. Cedeño-Rivera's actions were "suspicious, if not outright indicative of medical malpractice." (D.E. 116, ¶ 32). Assuming this is true, it is relevant only to alleging a state law claim for medical malpractice, not demonstrating a connection between the two hospital visits sufficient to justify the exercise of supplemental jurisdiction.

Plaintiffs allege several ways that HSA violated EMTALA with respect to her September 8 visit, including "abandonment of the patient without treatment and transfer … with [a] lack of

11

care provided for her admittedly critical renal condition," "delays in the transfer due to lack of money" and insurance, failure to provide "treatment needed to stabilize her critical renal failure condition," and "the request by the ambulance that [the patient's] parents … pay in cash for the transfer service before it took place." (D.E. 116, ¶¶ 30, 34, 38-39 (citing D.E. 80, pt. B, ¶¶ 35, 39, 52-61)). Moving defendants argue that, even if these allegations are sufficiently pleaded, they do not derive from a common nucleus of operative fact as the ones involving Dr. Cedeño-Rivera.

In support, moving defendants cite Espada-Santiago v. Hosp. Episcopal San Lucas, Civ. No. 07-2221 (ADC), 2009 WL 702350 (D.P.R. Mar. 11, 2009), a case also involving two separate emergency room visits by the same patient. In Espada-Santiago, plaintiffs alleged an EMTALA violation for one of the visits. For the other visit, however, plaintiffs failed sufficiently to allege any federal law violation. Nevertheless, plaintiffs sought to rely on supplemental jurisdiction for their state law medical malpractice claims. The court in Espada-Santiago determined that the two visits did not "form part of the same case or controversy sufficient to justify the exercise of pendent jurisdiction." 2009 WL 702350, at *3. Although it is true that the two visits in the instant case took place at the same hospital, unlike in Espada-Santiago, Dr. Cedeño-Rivera was not present during the September 8 visit.

The instant case differs from Espada-Santiago in two ways that indicate even more strongly that the August 14 and September 8 visits do not form part of the same case or controversy sufficient to justify the exercise of supplemental jurisdiction. First, while only four days elapsed between the two emergency room visits in Espada-Santiago, the patient in the instant case returned to HSA *twenty-three* days after the August 14 visit.[5]

---

[5] Although the patient did not return to the HSA emergency room until September 8, which is twenty-five days later, the patient was taken to HSA on September 6 with the purpose of being evaluated by pediatric nephrologists. (See

Second, the factual allegations in Espada-Santiago do not indicate that the patient went to an emergency room, visited a doctor, or received any medical treatment of any kind during the four-day period. See 2009 WL 702350, at *1. In contrast, during the period of twenty-three days in the instant case, the patient received substantial intervening medical attention, including at least three visits to the office of Dr. Evelyn González del Río ("Dr. González del Río")[6] and a visit to a separate laboratory for a CBC test. (See D.E. 80, pt. B, ¶¶ 18-26). During this time, Dr. González del Río determined that the patient "most likely" had a urinary tract infection, prescribed an antibiotic, and told Minter that the patient had to find a pediatric nephrologist from their insurance company. Id. ¶¶ 20-21. After the patient's legs and feet became "covered in purplish spots" and her vomiting worsened, Dr. González del Río conducted further laboratory tests and concluded that the patient "probably did not have a [urinary tract infection]" and prescribed no further treatments or referrals. Id. ¶¶ 23-25. That there was such an extensive period of time and significant intervening medical attention and treatment between visits further demonstrates that the two hospital visits constitute "separate and distinct actions." Espada-Santiago, 2009 WL 702350, at *3.

Plaintiffs claim that the two visits were "intimately intertwined" and "the witnesses, and common facts related in docket 80 are essentially the same for both the EMTALA and the state malpractice claims," (D.E. 116, at 22, 31-32), but the two hospital visits involve two completely separate sets of allegations (compare D.E. 80, pt. B, ¶¶ 10-16, with D.E. 80, pt. B, ¶¶ 27-59), on two separate dates, twenty-three days apart, with multiple doctors' visits, laboratory tests,

---

D.E. 80, pt. B, ¶ 27). Plaintiffs also allege that Minter called HSA sometime on or after August 17 inquiring about a pediatric nephrologist and was told that Dr. Urbano Pagán evaluated patients on Mondays and that the next clinic day was September 6, 2010. Id. ¶ 22. Plaintiffs do not cite this allegation in their response in opposition, nor is it clear that a mere telephone conversation inquiring about the general availability of a pediatric nephrologist would bridge the gap between the two visits to the emergency room.

[6] The patient visited Dr. González del Río's office on August 16, 17, and 24. (D.E. 80, pt. B, ¶¶ 18, 20, 24).

changed symptoms, and even diagnoses in between the two visits. As such, the patient's visit to HSA over three weeks earlier was too remote, temporally and causally, from her subsequent visit to derive from a common nucleus of operative fact for purposes of supplemental jurisdiction.

## V. CONCLUSION

Because there is no individual liability under EMTALA and there are no grounds to justify the exercise of supplemental jurisdiction against moving defendants, the motion to dismiss (D.E. 83) is hereby **GRANTED**. As such, the EMTALA claims against Dr. Ricardo Cedeño-Rivera and his conjugal partnership are **DISMISSED WITH PREJUDICE**, while the claims under Puerto Rico law against the same are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of January, 2013.

s/Marcos E. López  
U.S. Magistrate Judge