IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JOHN KENYON, *et al.*,

    **Plaintiffs,**

        **v.**                    **Civil No.** 11-1883 (FAB)

HOSPITAL SAN ANTONIO, INC., *et al.*,

    **Defendants.**

OPINION AND ORDER[1]

BESOSA, District Judge.

Before the Court is the magistrate judge's Report and Recommendation (R&R), recommending:

1.   that the EMTALA claims against Hospital San Antonio ("HSA") with respect to the patient's August 14, 2010 visit be dismissed with prejudice;

2.   that the claims brought pursuant to Puerto Rico law against HSA for that visit be dismissed without prejudice;

3.   that plaintiffs John Kenyon's and Rhea Minter's claim brought on their own behalf pursuant to EMTALA be dismissed with prejudice; and

4.   that all other claims against HSA not be dismissed.

---

[1] Lindsay Britton, a third-year law student at the University of New Hampshire School of Law, assisted in the preparation of this Opinion and Order.

(Docket No. 127.)   HSA filed its objection to the R&R on February 4, 2013.  (Docket No. 133.)  Plaintiffs did not object to the R&R.

## I.   BACKGROUND

### A.   Factual History

The Court takes the following facts as true, as pled in plaintiffs' complaint:

CKM, a minor, "began experiencing severe vomiting, fevers[,] and diarrhea" in August 2010.  (Docket No. 80 at p. 10.) On August 11, a doctor diagnosed a "summer virus" and gave CKM a prescription to relieve her vomiting and diarrhea.  Id.  CKM's symptoms worsened and her parents, John Kenyon and Rhea Minter, took CKM to the Añasco Emergency Room on August 13.  Id.  Noting symptoms of dehydration, fever, vomiting, diarrhea, allergic eyes, puffy face, and grey colored urine, the doctor treated CKM with intravenous fluids, Benadryl, and promethazine.  Id. at 11.  The doctor also ordered a complete blood count (CBC).  Id.  CKM was discharged from the hospital at 5:45 p.m. "with instructions to take her to the emergency room at San Antonio Hospital [(HSA)] in Mayaguez if her condition worsened."  Id.

At approximately 3:30 a.m. on August 14, CKM's parents took her to the emergency room (ER) at HSA in Mayaguez because she continued to suffer from a fever and vomiting.  Id.  A nurse triaged CKM at 3:30 a.m.  and Dr. Ricardo Cedeño-Rivera

("Dr. Cedeño-Rivera") evaluated her after 5:00 a.m. Id. Dr. Cedeño-Rivera ordered body fluid samples and "[a]ll laboratory results were read as normal." Id. He diagnosed CKM with gastroenteritis and treated her with Benadryl and intravenous fluids. Id. Dr. Jose Velez-Vargas ("Dr. Velez-Vargas") evaluated CKM at 9:10 a.m. and agreed with Dr. Cedeño-Rivera's diagnosis and treatment. Id. Dr. Maria Rodriguez-Maldonado ("Dr. Rodriguez-Maldonado") evaluated CKM at 3:50 p.m. and also agreed with the diagnosis of gastroenteritis. Id. She treated CKM with solumedrol and discharged her. Id.

Plaintiff Rhea told Dr. Rodriguez-Maldonado that she was concerned the lab results were read as normal even though they showed high levels of protein and KET. Id. at p. 11-12. Rhea also questioned Dr. Rodriguez-Maldonado about CKM's discolored urine, the blood in her urine, and the high creatinine levels found in the laboratory tests but Dr. Rodriguez-Maldonado "dismissed her concerns." Id. at p. 12. "Abnormally high levels of creatinine warn of possible malfunction or failure of the kidneys." Id. "Therefore, CKM was sent home from that first ER visit suffering from an undiagnosed emergency medical condition that was not stabilized although it was clear from the laboratory results done at the facility that she was already in renal failure." Id.

CKM's symptoms did not improve and throughout August and early September 2010 Rhea took CKM to several doctors. Id. at

p. 14-15.   After various laboratory tests, misdiagnoses, and treatments that did not alleviate CKM's symptoms, Dr. Navid Pourahmadi ("Dr. Pourahmadi") diagnosed CKM with renal failure on September 8, 2010.  Id. at p. 12-15.  Dr. Pourahmadi arranged for CKM to be stabilized at HSA and then transferred to the University Pediatric Hospital ("UPH") at the Puerto Rico Medical Center in San Juan.  Id. at p. 15.

CKM arrived at HSA at 3:10 p.m. on September 8.  Id. at p. 16.  Rhea informed the nurse that the doctors were expecting CKM, but the nurse told her "to take a number and wait her turn with the public."  Id.  CKM was triaged at 3:45 p.m.  Id. Dr. Rodriguez-Maldonado was the pediatrician on duty.  Id. Dr. Pourahmadi arrived at HSA around 5 p.m. on September 8 and Dr. Rodriguez-Maldonado "complained to Dr. Pourahmadi that she did not have facilities to treat CKM and it was a busy day."  Id. "Dr. Pourahmadi then told the doctor that the nephrology team at UPH was expecting CKM's transfer and had issued instructions for her stabilization."  Id.  Dr. Rodriguez-Maldonado evaluated CKM at 4:50 p.m. and ordered a renal sonogram.  Id. at p. 16-17.  By 7:10 p.m., "Dr. Rodriguez Maldonado ordered STAT blood work, including CBC, SMA, CXR, Ca, Mg, PO4[,] and urinalysis."  Id. at p. 17.  "The treatment prescribed included KUB, renal sonogram, cardiac monitor, pulse oxymeter, heparin lock, and to keep CKM in the ER's observation area."  Id.  Around the same time,

Dr. Rodriguez-Maldonado noted in the record that the medication CKM needed was not available at HSA.   Id.

Although Dr. Rodriguez-Maldonado ordered a transfer of CKM from HSA to UPH in San Juan at 7:30 p.m. on September 8 and Rhea completed the transfer control sheet at 9 p.m., the ambulance did not arrive to transfer CKM until 11 p.m.  Id. at p. 19-21.  The ambulance did not transfer CKM at that time, however, because the paramedic said that there were two babies waiting for transfers and there was more money in transferring the babies.  Id. at p. 19.  At 5 a.m. on September 9, a nurse told Rhea that the paramedic said the family needed to pay $350 prior to the transfer because UPH did not accept CKM's insurance.  Id. at p. 20.  Rhea called CKM's insurance company, MCS Reforma, and was told that the charge was incorrect and the family did not need to pay cash up front for CKM's transfer.  Id.  "By then a new ER doctor, Dr. Juan R. Jimenez-Barbosa, informed the parents that he had already made arrangements for an ambulance to be there by 1100 hours to transfer CKM."  Id. at p. 20.

CKM was transferred from HSA at 2:15 p.m. on September 9, approximately 19 hours after the transfer was initially requested. Id. at p. 21.  The Intensive Care Unit at UPH received CKM at 6:00 p.m. on September 9.  Id.  Plaintiffs allege that no medical records accompanied CKM when she was transferred except for the "transfer Control Sheet" that Rhea had filled out and signed on

September 8.  Id.  The Control Sheet contained "a list of documents and transfer information."  Id. at p. 18.

On October 4, 2010, CKM was transferred to the Pediatric Intensive Care Unit ("PICU") at UPH.  (Docket No. 1 at p. 23.)  In the transfer note, "the physician plainly state[d] that CKM's past arthritis, hematuria, lethargy[,] and weakness were not initially worked up as they should have been by CKM's physicians until Dr. Pourahmadi intervened."  Id.  Plaintiffs allege that this note "constitut[es] an unequivocal medical opinion as to the negligent and substandard medical care provided to CKM at the ER [at HSA]." Id.

As a result of her acute renal failure, CKM continues to suffer from multiple medical conditions requiring extensive ongoing treatment.  Id. at p. 24-25.  CKM undergoes daily dialysis and is waiting for a kidney transplant.  Id. at p. 25.  Her renal failure has also caused heart complications, including "at least one heart attack."  Id.

**B.   Procedural History**

Plaintiffs filed their first complaint on September 7, 2011 and named HSA, Dr. Maria Rodriguez-Maldonado, Dr. Evelyn Gonzalez-del Rio, Dr. X Doe, Dr. Y Doe, Dr. Z Doe, Lexmayris Ambulance, Inc., Insurance Company A, Insurance Company B, Insurance Company C, John Doe, Jane Doe, and Joe Doe as defendants. (Docket No. 1.)  Plaintiffs then filed a first amended complaint on

August 14, 2012, a second amended complaint on August 20, 2012, and a third amended complaint on November 9, 2012. (Docket Nos. 42, 43, & 80.)   In these amended complaints, plaintiffs added as defendants Dr. Juan Jimenez-Barbosa, Dr. Roberto Latoni, Dr. Ricardo Cedeño-Rivera, and Dr. Jose Velez-Vargas.   Id. Plaintiffs also added the spouses and conjugal partnerships of the defendant doctors and the insurance companies of HSA, Lexmayris Ambulance, and the defendant doctors as defendants.   Plaintiffs bring a claim against HSA pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA") and invoke the Court's supplemental jurisdiction to adjudicate medical malpractice claims brought pursuant to Commonwealth law against the individual defendants and Lexmayris.[2]   Defendants answered the third amended complaint.   (Docket Nos. 93, 96, 99, 100, 130, 131, & 132.) Dr. Latoni, his wife, and their conjugal partnership moved to dismiss the claims against them for failure to state a claim upon which relief can be granted.   (Docket No. 77.)   The Court granted the motion.   (Docket No. 123.)

---

[2] "It is well-settled in this jurisdiction that EMTALA provides a cause of action against certain participating hospitals, but not against individual physicians." Alvarez v. Vera, No. 04-1579, 2006 WL 2847376, at *5 (D.P.R. 2006) (citing Lebron v. Ashford Presbytarian Community Hosp., 995 F. Supp. 241 (D.P.R. 1998); see also Del Carmen Guadalupe v. Negron Agosto, 299 F.3d 15, 19 (1st Cir. 2002) (noting that all circuits that have addressed the issue have decided that EMTALA does not provide a cause of action against individuals).

The Court referred this case to the United States magistrate judge, who issued a thorough Report and Recommendation ("R&R") on January 17, 2013.  (Docket No. 127.)  The R&R recommended that HSA's motion to dismiss be **GRANTED in part** and **DENIED in part**.  The magistrate judge found the facts alleged insufficient to state a claim for failure to screen CKM or failure to stabilize CKM prior to transfer, but denied the motion to dismiss to the extent that Plaintiffs alleged a violation of EMTALA's certification requirements.  The parties had until February 4, 2013 to object to the R&R.  Defendants objected to the R&R as to the certification claim and included as an exhibit the certificate for transfer.  (Docket Nos. 133 & 134-2.)  Plaintiffs failed to object to the R&R.  Therefore, they have waived the right to further review in the district court.  Davet v. Maccarone, 973 F.2d 22, 30-31 (1st Cir. 1992).

The Court has made an independent examination of the entire record in this case and **ADOPTS in part** and **REJECTS in part** the magistrate judge's findings and recommendations.

## II.  LEGAL STANDARD

### A.  Standard of Review Pursuant to 28 U.S.C. § 636(b)

A district court may refer a pending motion to a magistrate judge for a report and recommendation.  See 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Loc. Rule 72(b).  Any party adversely affected by the report and recommendation may file

written objections within fourteen days of being served with the magistrate judge's report.  Loc. Rule 72(d).  See 28 U.S.C. § 636(b)(1).  A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made."  Ramos-Echevarria v. Pichis, Inc., 698 F.Supp.2d 262, 264 (D.P.R. 2010); Sylva v. Culebra Dive Shop, 389 F.Supp.2d 189, 191-92 (D.P.R. 2005) (citing United States v. Raddatz, 447 U.S. 667, 673 (1980)).  Failure to comply with this rule precludes further review.  See Davet, 973 F.2d at 30-31. 1992).  Borden v. Secretary of H.H.S., 836 F.2d 4, 6 (1st Cir. 1987).  In conducting its review, the court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636 (a)(b)(1); Templeman v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir. 1985); Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc., 286 F.Supp.2d 144, 146 (D.P.R. 2003).  Furthermore, the Court may accept those parts of the report and recommendation to which the parties do not object.  See Hernandez-Mejias v. General Elec., 428 F.Supp.2d 4, 6 (D.P.R. 2005) (citing Lacedra v. Donald W. Wyatt Detention Facility, 334 F.Supp.2d 114, 125-126 (D.R.I. 2004)).

**B.    Standard of Review Pursuant to Fed. R. Civ. P. 12(b)(6)**

A court may dismiss a complaint that fails to state a claim upon which relief can be granted.  Fed.R.Civ.P. 12(b)(6).

The Court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." Rodriguez-Reyes, 711 F.3d at 52-53 (quoting Santiago v. Puerto Rico, 655 F.3d 61, 72 (1st Cir. 2001)). The Court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." Rodriguez-Reyes, 711 F.3d at 53 (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)).

The factual material pled must be sufficient "to raise a right to relief above the speculative level," and to permit the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Supreme Court has held that a plaintiff's pleading must cross "the line between possibility and plausibility." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 577 (2007). "[A] prima facie case is not the appropriate benchmark for determining whether a complaint has crossed the plausibility threshold." Rodriguez-Reyes, 711 F.3d at 51. Nevertheless, "[t]hose elements are part of the background against which a plausibility determination should be made." Id. at 54. The Court will draw "on its judicial experience and common sense" in evaluating the complaint's plausibility. Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012) (internal citation omitted).

"If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (*en banc*).

## III. DISCUSSION

Plaintiffs' complaint is not a model of clarity. At times it faults HSA for both transferring CKM without stabilizing her condition and failing to expedite a transfer that was medically necessary because HSA was not capable of stabilizing her condition. (Docket No. 80 at p. 31–33.)  In an abundance of caution, the Court will analyze Plaintiffs' complaint as an attempt to plead claims pursuant to EMTALA for failure to screen and failure to stabilize on August 14 and failure to screen, failure to stabilize, and failure to transfer CKM appropriately on September 8.  For the following reasons, each possible EMTALA claim asserted in the complaint fails and defendant HSA's motion to dismiss, (Docket No. 106), is **GRANTED.**

### A.    Failure to Screen on August 14

Plaintiffs allege that HSA "violated EMTALA by failing to provide a screening reasonably ascertained to identify a CRITICAL medical condition and to stabilize the patient prior to discharge despite her critical laboratory results and Mother's objections." (Docket No. 80 at 27.)  Plaintiffs also allege, however, that "it

was clear from the laboratory results done at [HSA] that [CKM] was already in renal failure" on August 14.  Id. at p. 11.

        The Emergency Medical Treatment and Active Labor Act ("EMTALA") was enacted in response to "the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance." Correa v. Hosp. San Antonio, 69 F.3d 1184, 1189 (1st Cir. 1995) (quoting H.R. Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), reprinted in 1986 U.S.C.C.A.N. 42, 605).  The statute provides a cause of action to fill the gaps in state medical malpractice laws that provided no recourse for indigent patients who were refused treatment; it does not create a federal cause of action for medical malpractice. Fraticelli-Torres v. Hosp. Hermanos, 300 F. App'x 1, 4–5 (1st Cir. 2008) (citing Reynolds v. MaineGeneral Health, 218 F.3d 78, 83–84 (1st Cir. 2000)).  EMTALA requires the emergency rooms of participating hospitals to provide "an appropriate medical screening examination" "if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition." 42 U.S.C. § 1395dd(a).  If the hospital diagnoses an emergency medical condition, then it must provide either treatment to stabilize the emergency medical condition or an appropriate transfer to another medical facility. 42 U.S.C. § 1395dd(b).

> To establish an EMTALA violation, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.

Correa, 69 F.3d at 1190.

It is possible for an emergency room to comply with the screening provision of EMTALA but misdiagnose the patient's condition.  Del Carmen Guadalupe, 299 F.3d at 21.

A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints.  Correa, 69 F.3d at 1192.  "[F]aulty screening, in a particular case . . . does not contravene the statute."  Id. at 1192-93.  Allegations that a hospital breached its duty of care in screening and diagnosing a patient state a claim for medical malpractice pursuant to state tort law, not an EMTALA violation. Del Carmen Guadalupe, 299 F.3d at 21 (citing Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991)); see also Loaisiga-Cruz v. Hosp. San Juan Bautista, 681 F. Supp. 2d 130, 135 n.2 (D.P.R. 2010) (citing Correa, 69 F.3d at 1194).

By plaintiffs' own admission, CKM received screening on August 14 and "it was clear from the laboratory results done at [HSA] that [CKM] was already in renal failure." (Docket No. 80 at p. 11.)   HSA provided a medical screening to CKM that was reasonably calculated to diagnose, and should have lead HSA to diagnose, CKM's renal failure as an emergency medical condition. Therefore, plaintiffs' allegations that "CKM's medical condition was not correctly diagnosed on August 14, 2010," do not state an EMTALA violation.

Plaintiffs' allegation that Dr. Rodriguez-Maldonado dismissed Rhea's concern over CKM's creatinine levels does not state a claim for disparate screening because EMTALA only requires that a hospital conduct the tests. Del Carmen Guadalupe, 299 F.3d at 20-21 (citing Correa, 69 F.3d at 1192).   Dr. Rodriguez-Maldonado's "discriminatory disregard of [Rhea's] pleadings because of what she felt was that she was poor, black[,] and spoke no Spanish" does not violate the screening provision of EMTALA because HSA provided a medical screening to CKM. (Docket No. 80 at p. 28.) The factual allegations in the complaint show that while Dr. Rodriguez-Maldonado and HSA may have committed medical malpractice by failing to recognize that CKM's test results showed she was in renal failure, HSA did perform the tests that should have lead the doctors to diagnose CKM's condition.   Therefore,

plaintiffs' claim that HSA failed to screen CKM properly pursuant to EMTALA on August 14 fails.

**B.    Failure to Stabilize on August 14**

EMTALA provides a cause of action for a limited number of circumstances where state tort law does not provide a remedy for indigent patients that hospitals refuse to treat. Fraticelli-Torres, 300 F. App'x at 4-5 (citing Reynolds, 218 F.3d at 83-84). To prevent EMTALA from becoming a federal medical malpractice statute, the diagnosis of an emergency medical condition is a predicate to the stabilization requirement of 42 U.S.C. § 1395dd(b). Reynolds, 218 F.3d at 85 (collecting cases). "[EMTALA] does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." Id. (citing Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 145 (4th Cir. 1996)). A hospital is also only required to stabilize a patient prior to transferring the patient to another facility or discharging the patient. Alvarez-Torres v. Ryder Mem. Hosp., Inc., 582 F.3d 47, 51-52 (1st Cir. 2009) (citing Correa, 69 F.3d at 1190). The statute provides:

> (b) Necessary stabilizing treatment for emergency medical conditions and labor (1) In general
>
> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital **and the**

**hospital determines that the individual has an emergency medical condition**, the hospital must provide either–

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b) (emphasis added).

Thus, by its plain language, the statute does not provide a cause of action when a hospital does not stabilize an emergency medical condition that it negligently failed to diagnose. An emergency medical condition is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . serious impairment to bodily functions, or . . . serious dysfunction of any bodily organ or part . . . ." 42 U.S.C. § 1395dd(e)(1).

Plaintiffs allege that "CKM was sent home from that first ER visit suffering from an undiagnosed emergency medical condition that was not stabilized although it was clear from the laboratory results done at the facility that she was already in renal failure." (Docket No. 80 at p. 12.) This allegation does not state a claim for a violation of EMTALA because the complaint expressly states that CKM's emergency medical condition was not diagnosed and, therefore, based on the plain language of the

statute, HSA had no obligation to stabilize the condition. Therefore, plaintiffs' claim that HSA failed to stabilize CKM's emergency medical condition on August 14 in violation of EMTALA fails.

### C.   Failure to Screen on September 8

Plaintiffs' claim that HSA failed to screen CKM properly on September 8 also fails.  The complaint shows that HSA conducted extensive screening to diagnose and confirm CKM's acute renal failure.  "By 7:10 p.m. [on September 8] Dr. Rodriguez-Maldonado ordered STAT blood work, including CBC, SMA, CXR, Ca, Mg, PO4 and urinalysis." (Docket No. 80 at p. 17.)  "The treatment prescribed included KUB, renal sonogram, cardiac monitor, pulse oxymeter, heparin lock, and to keep CKM in the ER's observation area." Id. Based on the facts contained in the complaint, HSA screened CKM and diagnosed her emergency medical condition.

### D.   Failure to Stabilize on September 8

Plaintiffs next attempt is to state a claim for failure to stabilize CKM's condition prior to transferring her to UPH.  The complaint states, however, that "Dr. Rodriguez Maldonado[] complained to Dr. Pourhamadi [sic] that she did not have the facilities to treat CKM and that it was a busy day at the ER." Id. at p. 16.  Dr. Rodriguez-Maldonado also wrote in CKM's medical record that HSA did not have the recommended medication to treat CKM's renal failure.  Id. at p. 17.  The complaint states that

"[l]aboratory results also reported at 11:35 a.m. [on September 9]
indicated critically high levels of creatinine, an absolute sign
that CKM's medical condition had not been treated nor stabilized.
CKM was still at the [HSA] ER.  Still, there was no medication
available to treat her condition." Id. at p. 20.  Accepting these
facts as true, plaintiffs have not stated a claim for an EMTALA
violation.

> As noted previously,

> If any individual . . . comes to a hospital and the
> hospital determines that the individual has an emergency
> medical condition, the hospital must provide either—

> (A) within the staff and facilities available at the
> hospital, for such further medical examination and such
> treatment as may be required to stabilize the medical
> condition, or

> (B) for transfer of the individual to another medical
> facility in accordance with subsection (c) of this
> section.

42 U.S.C. § 1395dd(b).

> A hospital may transfer an unstabilized patient without
> violating EMTALA if a physician . . . has signed a
> certification that[,] based upon the information
> available at the time of transfer, the medical benefits
> reasonably expected from the provision of appropriate
> medical treatment at another medical facility outweigh
> the increased risks to the individual . . . and . . . the
> transfer is an appropriate transfer . . . to that
> facility.

42 U.S.C. § 1395dd(c)(1).

> An appropriate transfer to a medical facility
> is a transfer—

> (A) in which the transferring hospital provides the
> medical treatment within its capacity which minimizes the

risks to the individual's health and, in the case of a
woman in labor, the health of the unborn child;

(B) in which the receiving facility--

    (i) has available space and qualified
    personnel for the treatment of the individual,
    and

    (ii) has agreed to accept transfer of the
    individual and to provide appropriate medical
    treatment;

(C) in which the transferring hospital sends to the
receiving facility all medical records (or copies
thereof), related to the emergency condition for which
the individual has presented, available at the time of
the transfer, including records related to the
individual's emergency medical condition, observations of
signs or symptoms, preliminary diagnosis, treatment
provided, results of any tests and the informed written
consent or certification (or copy thereof) provided under
paragraph (1)(A), and the name and address of any on-call
physician (described in subsection (d)(1)(C) of this
section) who has refused or failed to appear within a
reasonable time to provide necessary stabilizing
treatment;

(D) in which the transfer is effected through qualified
personnel and transportation equipment, as required
including the use of necessary and medically appropriate
life support measures during the transfer; and

(E) which meets such other requirements as the Secretary
may find necessary in the interest of the health and
safety of individuals transferred.

42 U.S.C. § 1395dd(c)(1).

        There is no dispute that CKM was diagnosed with an

emergency medical condition on September 8, 2010.  Therefore, HSA

was required to provide stabilizing treatment prior to transfer or

comply with all of the conditions of section 1395dd(c)(1).

Plaintiffs admit that HSA did not have the medication necessary to

stabilize CKM's condition and that a transfer to UPH was medically necessary. (Docket No. 80 at p. 30–32.) Dr. Rodriguez-Maldonado wrote in CKM's medical record that the patient was to be transferred to UPH because she needed dialysis and a pediatric nephrologist.[3] (Docket No. 80 at p. 17, Docket No. 116-2 at p. 5.) Plaintiff Rhea signed the transfer Control Sheet and the medical record stating that CKM would be transferred to UPH. (Docket No. 80 at p. 18, Docket No. 116-2 at p. 5.) UPH was expecting CKM's transfer and had already indicated that it would accept her transfer. (Docket No. 80 at p. 16.) UPH had even issued orders for CKM's stabilization at HSA prior to her transfer to UPH. Id. CKM was transferred to UPH in an ambulance staffed by a paramedic. Id. at p. 21. From these facts it is clear that HSA complied with the requirements of section 1395dd(c)(1)(A) and section 1395dd(c)(2)(A), (B), (D), and (E), and, therefore, met the EMTALA stabilization requirements. Thus, the only dispute as to whether the transfer was an appropriate transfer pursuant to EMTALA is the

---

[3] "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alt. Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001). There is an exception "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Id. The medical records attached to plaintiffs' response in opposition to HSA's motion to dismiss, (Docket No. 116), are both central to plaintiffs' claim and referred to in the complaint.

allegation that CKM's medical records were not sent to UPH as required by section 1395dd(c)(2)(C).

Plaintiffs allege that "[t]here is no transfer document in the ER record, and no certification as required by EMTALA, nor any documentation that any medical record accompanied CKM in her transfer, except for the Control Sheet of [September 8] at 9:00 p.m." Id. at p. 21. The Control Sheet had "a list of documents and transfer information." Id. at p. 18. Dr. Rodriguez-Maldonado's note that CKM needed to be transferred to UPH for a pediatric nephrologist and dialysis is her certification that CKM needed to be transferred and plaintiffs do not dispute that the transfer was medically necessary. (Docket No. 134-2 at p. 1.)

Although plaintiffs also allege that CKM's medical records were not transferred with CKM, the complaint shows that the doctors at UPH were awaiting her arrival and had issued instructions for her stabilization at HSA. Even if the Control Sheet did not contain the medical records that UPH required, the complaint shows that UPH had sufficient medical records from some source to provide CKM with the treatment she required. Id. at p. 22. UPH provided blood transfusions for CKM's anemia on September 9 and began dialysis on September 10. Id. The purpose of EMTALA is to provide a remedy for patients who are refused treatment. Fraticelli-Torres, 300 F. App'x at 4-5. HSA did not refuse to treat CKM. The necessary medication was not available at

HSA and HSA then transferred CKM to UPH for treatment and UPH provided plaintiff CKM with the necessary treatment.

For all these reasons, HSA did not violate EMTALA when it transferred CKM without stabilizing her emergency medical condition on September 8.

### E.    Failure to Facilitate Transfer on September 8

Plaintiffs lastly attempt to allege an EMTALA violation for HSA's alleged failure to expedite CKM's transfer to UPH. "That HAS [sic] ER did nothing to facilitate the transfer and that money was required as a precondition for the transfer is a patently clear violation of the child's EMTALA rights." (Docket No. 116 at p. 26.) "[D]ue to her indigent condition, [CKM] was treated differently than the patients that indeed were transferred by land ambulance at the hospital's behest and in her stead on the evening of September 8, 2010." Id. at p. 27.

As a limited "anti-dumping" statute, EMTALA does not create an affirmative right to a transfer to another medical facility or for the best medical treatment available. Fraticelli-Torres, 300 F. App'x 1, 7 (1st Cir. 2008). "A hospital's negligent medical decision not to transfer a critical patient promptly to another hospital to receive necessary treatment might trigger state-law medical malpractice liability, but it could not constitute an EMTALA anti-dumping violation." Id.

Plaintiffs allege that HSA "fail[ed] to compel the transfer of CKM" and "substitut[ed] the 'paramedic' [sic] medical judgment for that of the specialist physicians waiting for the timely transfer of CKM to Hospital Pediatrico Universitario for critical renal care." (Docket No. 80 at p. 33–34.) The complaint reveals, however, that two doctors made arrangements for CKM's transfer and when the ambulance did not arrive on time on September 9, a nurse called Lexmayris. HSA and Lexmayris are separate entities and HSA cannot be responsible for Lexmayris's allegedly profit-driven disregard for CKM's medical needs. Moreover, EMTALA only applies to certain hospitals, 42 U.S.C. § 1395dd(a) & (b), and Lexmayris is not a hospital. Therefore, Lexmayris did not have a duty to transfer CKM and the failure to transfer CKM does not state an EMTALA violation.

**G.    State Law Claims**

Because HSA is the only proper defendant pursuant to EMTALA, the Court reads the complaint as asserting state law claims against all other defendants. Because the Court dismisses the EMTALA claims, there is no longer a federal question to ground jurisdiction and the Court declines to exercise its supplemental jurisdiction over the state law claims. Plaintiffs' supplemental state law claims are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3).

**IV.   CONCLUSION**

For the foregoing reasons, the Court **ADOPTS in part** and **REJECTS in part** the magistrate judge's findings and recommendations.   The Court **GRANTS** defendant HSA's motion to dismiss plaintiffs' EMTALA claims with prejudice and **DISMISSES** all state law claims without prejudice.   Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, June 28, 2013.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE